UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>DEREK JAMES TUSCHOFF,<br><br>    Defendant. | Case No. 1:19-cr-00233-1-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Derek James Tuschoff's Motion to Suppress. Dkt. 46. The motion has been fully briefed and an evidentiary hearing was held on February 17, 2020. Upon review, and for the reasons set forth below, the Court DENIES Tuschoff's Motion.

## II. FACTS

On January 3, 2019, Idaho State Police ("ISP") began investigating Derek Tuschoff for drug trafficking after a cooperating source told law enforcement that Tuschoff was selling him roughly a pound of methamphetamine multiple times a week. Based on this tip, ISP started conducting surveillance at Tuschoff's home in Boise, Idaho. Over the next month, ISP searched abandoned garbage from Tuschoff's home and found drug paraphernalia. When tested, the ISP lab confirmed that the paraphernalia contained trace amounts of methamphetamine and heroine. ISP also found mail addressed to Tuschoff in the garbage—validating that Tuschoff lived at the residence and that the garbage was his.

On March 5, 2019, ISP detectives observed Tuschoff at a Boise Pizza Hut conducting short meetups with various individuals. Police initiated a traffic stop for a canceled registration on one of the individuals who had met with Tuschoff in the parking lot and found the individual in possession of methamphetamine. The individual confirmed that he bought a half-ounce of methamphetamine from Tuschoff in the Pizza Hut parking lot.

On April 3, 2019, ISP detectives observed Tuschoff at a Meridian Chili's engaged in what they believed to be a hand-to-hand drug transaction. Police conducted a traffic stop on the individual who met with Tuschoff at Chili's and found one ounce of methamphetamine in her possession. In a subsequent interview with detectives, the individual confirmed that she bought the methamphetamine from Tuschoff and that he also promised to sell her four more ounces that night. Further, the individual told the officers that Tuschoff kept pounds of methamphetamine in his bedroom and that there were always guns at his house.

In May 2019, detectives requested, and received, a warrant from United States Magistrate Judge Candy W. Dale authorizing ISP to collect GPS and cellphone data from Tuschoff's phone. On May 14, 2019, ISP observed an individual stop at Tuschoff's residence and leave ten minutes later. Police conducted a traffic stop on the individual and found 2 grams of heroin and 2.2 grams of methamphetamine in the individual's possession. In an interview with detectives, the individual stated he bought the drugs from Tuschoff, and that over the past three months he estimated he had bought roughly a pound of drugs from Tuschoff.

MEMORANDUM DECISION AND ORDER - 2

On May 16, 2019, detectives learned through GPS data that Tuschoff had gone to Phoenix, Arizona. When Tuschoff returned to Boise, cellphone data indicated that Tuschoff was in contact with a known methamphetamine supplier in Eastern Idaho. Detectives then received an extension to the search warrant and continued the surveillance of Tuschoff. On June 19, 2019, detectives learned that Tuschoff had given an individual $2,400 to purchase drugs in Las Vegas, Nevada. Once the individual returned to Boise, police arrested the individual for drug trafficking. The individual was in possession of five ounces of heroine, a small amount of methamphetamine, and multiple firearms. The individual confirmed that Tuschoff gave him money to buy drugs and also explained that Tuschoff kept pounds of drugs at his residence. On June 30, 2019, GPS data indicated that Tuschoff had driven to Pocatello, Idaho. ISP then verified Tuschoff was staying at the Marriott Hotel in Pocatello with two individuals from Arizona: Robert Mahan and Brooke Chamberlain.

On July 1, 2019, detectives observed the three individuals leaving the hotel. Three hours later, via GPS data, detectives learned Tuschoff was heading back to Boise on Interstates 84. Detectives were suspicious that Tuschoff had bought drugs from Mahan and Chamberlain for distribution in Boise. At approximately 2:40pm, ISP Detective Jerod Sweesy saw Tuschoff in Jerome County at mile post 194. Detective Sweesy noticed Tuschoff's vehicle had very dark window tinting—possibly in violation of Idaho Code Section 49-944—and notified Trooper Michael Hausauer and Trooper Michael Marrott of his suspicions.

Later, Trooper Hausauer conducted a traffic stop on Tuschoff. Trooper Hausauer

spoke with Tuschoff, obtained Tuschoff's driving information, and went back to his car to verify the information and prepare a tint meter check. At this point, Trooper Marrott approached Tuschoff's vehicle and asked him to turn off his car to prevent brush fire. Trooper Marrott then asked if Tuschoff had anything illegal in the car, and noted that Tuschoff's nervousness increased during this inquiry.[1] Trooper Marrott asked Tuschoff to exit the car so he could deploy his dog, Kali, around the car. A discussion then ensued as to why Tuschoff had to leave the car. Trooper Marrott told Tuschoff that he needed to exit the car for safety reasons. Tuschoff asked again, and Trooper Marrott replied that *Pennsylvania v. Mimms* allowed him to the order the defendant to exit his vehicle "for any reason." Dkt. 46, Exhibit 5, at 15:10-11.[2] After Trooper Marrott's repeated attempts to order Tuschoff out of the car, Trooper Marrott motioned to Trooper Hausauer to assist him in removing Tuschoff from the vehicle. Trooper Hausauer opened the driver side door, removed the keys, and threw them on the ground. With his tazer pointed towards Tuschoff, Trooper Marrott ordered Tuschoff to exit the car. As Tuschoff was getting out of the car, the Troopers arrested Tuschoff for "Obstruct and Delay."

After Tuschoff was place in Trooper Hausauer's car, Trooper Marrott conducted a drug sniff around Tuschoff's vehicle. Kali alerted Trooper Marrott on the truck area of the vehicle. Trooper Hausauer then conducted a tint meter check and found Tuschoff's vehicle to be in violation of Idaho Code Section 49-944. Tuschoff was taken to ISP District IV and

---

[1] Trooper Marrott specifically noted that when he asked this question, Tuschoff's carotid artery started pulsating rapidly in his neck Dkt. 46-2, at 9.

[2] Exhibit 5 is video footage from Tropper Marrott. All the video evidence in this case was delivered to the Court on a DVD. The placeholder in the record for this particular video is Dkt. 46-2, at 16.

his car was driven to an ISP garage. Officers later found 785.62 grams (1.73 lbs.) of actual methamphetamine and 234 fentanyl pills in a brief case lying in the back seat of the car. The officers also found a notebook with names, which they believed to be a drug ledger. Tuschoff was booked in Jerome County Jail for Trafficking Methamphetamine and Obstruct and Delay.

After Tuschoff's arrest, law enforcement learned that Tuschoff had made two money orders to Mahan in the amounts of $1,500 and $1,600. On July 2, 2019, law enforcement stopped Mahan and Chamberlain and found in their possession $37,500 in cash, an electronic money counter, 34.43 grams of methamphetamine, fentanyl pills, marijuana, and multiple items of drug paraphernalia. On July 10, 2019, Tuschoff and the two coconspirators, Mahan and Chamberlain, were charged with Conspiracy to Distribute Methamphetamine and Possession with Intent to Distribute Methamphetamine and Heroin. Dkt. 1. On January 28, 2020, Tuschoff filed the instant Motion to Suppress. Dkt 46.

### III. LEGAL STANDARD

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Mapp v. Ohio*, 367 U.S. 643 (1961). Generally, searches and seizures conducted without a warrant are "*per se* unreasonable under the Fourth Amendment" subject to "a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (citations omitted).

An exception to the warrant requirement that is pertinent to this case is a seizure for a traffic violation. *Rodriquez v. United States,* 575 U.S. 348, 354 (2015). Such a seizure is

only justified if the officer diligently pursues the purpose of the stop; any deviations or delays for unrelated investigations violate the driver's Fourth Amendment right, unless supported by independent reasonable suspicion. *Id*. at 354-55.

Additionally, the automobile exception to the warrant requirement permits police to search a vehicle when the car is "readily mobile" and "probable cause exists to believe it contains contraband." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (cleaned up). The police may search both an automobile and the containers within it "where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991).

But, if no exceptions to the exclusionary rule apply, evidence must be suppressed. Evidence that the government obtains in violation of the Fourth Amendment is generally excluded from the prosecution of the alleged violator. *Wong Sun v. United States,* 371 U.S. 471, 484-85 (1963). Further, evidence discovered through "exploitation of" an illegal search or seizure, must also be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

## IV. ANALYSIS

Tuschoff's Motion to Suppress raises three arguments, each based on the underlying knowledge of Trooper Hausauer and Trooper Marrott. First, Tuschoff argues that Troopers Hausauer and Marrott prolonged the seizure and deviated from the purpose of the traffic stop—to investigate and cite Tuschoff for his dark window tint—to facilitate an independent drug investigation. Second, Tuschoff maintains there was no legal basis for the Troopers to order Tuschoff to exit the vehicle. And third, Tuschoff contends there was

no legal basis for the Troopers to arrest Tuschoff for "Obstruct and Delay." While these three arguments were based on the underlying knowledge of the officers involved in the traffic stop, Tuschoff did not put forth an express argument addressing their knowledge, or lack thereof, of the drug investigation.

The Government responded to Tuschoff's Motion by highlighting that the officers had both reasonable suspicion that Tuschoff was violating Idaho Code Section 49-944, *and* reasonable suspicion that Tuschoff was trafficking drugs. The Government postures that the Troopers' second suspicion is valid under the collective knowledge doctrine.

In his reply brief, Tuschoff argues that Troopers Hausauer and Marrott did not have the collective knowledge of Tuschoff's drug investigation, thus eliminating the reasonable suspicion that Tuschoff was trafficking drugs. This final argument concerning the collective knowledge doctrine underpins each of Tuschoff's other arguments. Accordingly, the Court will address the collective knowledge doctrine first.

### A. Collective Knowledge

In order for the collective knowledge doctrine to apply, the Court must determine whether the investigatory search complied with the Fourth Amendment by looking to the "collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action]." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (citing *United States v. Sutton,* 794 F.2d 1415, 1426 (9th Cir.1986). When an officer with direct knowledge of facts giving rise to a reasonable suspicion of criminal activity orders another officer not involved in the

investigation to conduct a traffic stop, search, or arrest, the collective knowledge doctrine is satisfied. *Ramirez*, 473 F.3d at 1031. Importantly, the collective knowledge doctrine has no requirement regarding the content of what must be shared, only that the officer with personal knowledge of facts giving rise to a reasonable suspicion communicates an appropriate order to another officer to conduct a stop, search, or arrest. *Id.*

In *Ramirez*, the Defendants (including Ramirez) came to law enforcement's attention while law enforcement was conducting surveillance regarding drug trafficking at a residence. 473 F.3d at 1028. One of the surveillance officers issued a request over the radio for a uniformed officer to initiate a traffic stop. *Id.* at 1029. The surveillance officers did this because they did not want to make contact with the Defendants themselves and jeopardize the ongoing drug investigation. *Id.* A traffic stop was initiated, a search ensued, drugs were found, and the Defendants were subsequently indicted. *Id.* at 1030. Ramirez filed a Motion to Suppress alleging, among other things, that the officer who pulled him over (for a lane violation) lacked personal knowledge of the facts giving rise to the automobile search (based on the drug suspicion). *Id.* The Government relied on the collective knowledge doctrine in opposing Ramirez's motion. *Id.* The District Court found that the search was supported by the collective knowledge of all officers involved and denied the Motion to Suppress. *Id.* The Ninth Circuit affirmed noting that:

> [T]he collective knowledge doctrine includes no requirement regarding the *content* of the communication that one officer must make to another. Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may

conduct a warrantless stop, search, or arrest without violating the Fourth Amendment.

*Ramirez*, 473 F.3d at 1037.

This case is similar to *Ramirez* because an officer with direct knowledge of facts giving rise to a reasonable suspicion of criminal conduct directed officers not involved in the investigation to conduct a traffic stop. Here, ISP detectives had been investigating Tuschoff for drug trafficking over the course of six months before he was arrested. Detective Sweesy, an officer involved in the investigation, observed Tuschoff on Interstate 84 heading west toward Boise and directed Troopers Hausauer and Marrott to conduct a traffic stop. Detective Sweesy had personal knowledge of Tuschoff's drug trafficking investigation which provided him, in turn, with reasonable suspicion that Tuschoff had been in Pocatello to buy drugs and was heading back to Boise to distribute the drugs. Because Detective Sweesy had personal knowledge of facts giving rise to a reasonable suspicion and communicated an appropriate order to Troopers Hausauer and Marrott to conduct a traffic stop, the collective knowledge doctrine is satisfied. Therefore, the trooper's investigatory search of Tuschoff's vehicle complied with the Fourth Amendment.

At the hearing, the Government fully admitted that the traffic stop on July 1, 2019, was a pretext stop and that the prominent reason for the stop was the suspicion that Tuschoff was trafficking drugs. A pretext stop is permissible if the officer has objective, probable cause that a driver is violating a law. *See United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000), *as amended* (July 7, 2000) (explaining, "[t]he fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances

justify the stop"). Objectively, Tuschoff's stop was legal. Driving with extremely dark window tint, which only allows for 5% light transmission, violates Idaho Code Section 49-944. The pretext stop was valid because the officers had objective, probable cause to believe that Tuschoff was violating a traffic law. Further, the subsequent search of Tuschoff's vehicle, relating to the suspicion that there were drugs in the vehicle, was not invalid just because the traffic stop was pretextual. *See Wren v. United States*, 517 U.S. 806, 812–13, (1996) ("a traffic-violation arrest … would not be rendered invalid by the fact that it was "a mere pretext for a narcotics search") (cleaned up)). Therefore, the traffic stop was lawful as well as the subsequent search and seizure.

Notwithstanding the Court's overarching conclusion about the legality of the stop and search based on the collective knowledge doctrine, it must nonetheless address Tuschoff's specific arguments and how the collective knowledge doctrine plays into that analysis.

## B. The Delay

### 1. *Unreasonably Delay*

Tuschoff argues that Trooper Hausauer and Trooper Marrott delayed the traffic-stop by acting outside of the purpose of the stop. If the Court finds there was such a delay, it must determine if the delay was justified by a reasonable suspicion of drug activity.

Broadly speaking, the tolerable duration of police inquiries in a traffic-stop context is determined by the seizure's "mission." *Rodriguez*, 575 U.S. at 354. Beyond determining whether to issue a traffic ticket, an officer's "mission" during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants

against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. *Id.* at 355.

A dog sniff is not "an ordinary incident of a traffic-stop." *Id.* at 355–56. Accordingly, inquiries or actions (such as a dog sniff) that measurably extend the duration of the stop and that are outside of the purpose of the stop's mission must be justified by reasonable suspicion independent of the traffic investigation. *Arizona v. Johnson*, 555 U.S 323, 333 (2009). Finally, the facts forming a reasonable suspicion must be based upon "objective observation" and the inferences law enforcement draws from those facts must be "objectively reasonable." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1123 (9th Cir. 2002).

In sum, there must be reasonable suspicion to prolong any seizure; otherwise, law enforcement's actions must not unreasonably prolong the duration of the seizure.[3] As it relates to a dog sniff, the act must either not delay the traffic stop at all, or if it does, there must be a reasonable suspicion of criminal activity for the delay to be justified.

Tuschoff concedes the time in which Trooper Hausauer was checking his driver information and preparing the tint meter check was reasonable. It was the tasks performed outside of the tint meter check that Tuschoff argues were unreasonable. While Trooper Hausauer was performing tasks related to the window tint investigation, Trooper Marrott

---

[3] It goes without saying that *some* incremental delays are per se reasonable simply due to the nature of police work. As the United States Supreme Court has noted, "traffic stops are especially fraught with danger to police officers." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (cleaned up).

walked up to Tuschoff's car to inquire about illegal contraband. Trooper Marrott then asked Tuschoff to exit the car for safety, which led to an oral altercation. Tuschoff repeatedly asked why he needed to exit the vehicle. After multiple attempts to order Tuschoff out of the vehicle, including threatening to taze Tuschoff, Trooper Marrott motioned to Trooper Hausauer for assistance. Tuschoff argues that Trooper Marrott delayed the traffic stop when he asked Trooper Hausauer for assistance. The Government contends that it was Tuschoff's own noncompliance that extended the traffic stop.

A delay becomes unreasonable when an officer prolongs the traffic stop by inquiring into matters unrelated to the stop's "mission." *United States v. Evans*, 786 F.3d 779 (9th Cir. 2015). That said, a traffic stop is not extended beyond the time necessary to perform tasks related to the stop's mission when another officer conducts a dog sniff while the stop is in progress. *See generally Illinois v. Caballes*, 543 U.S. 405 (2005). Here, the initial mission of the traffic stop was to investigate the window tint.[4] Trooper Hausauer was performing this "mission" while Trooper Marrott was inquiring about illegal contraband. At that point, there was no delay in the traffic stop. However, Trooper Hausauer's performance of the original mission was halted when Trooper Marrott motioned for his assistance. It is unclear whether Trooper Marrott would have successfully conducted the dog sniff while Trooper Hausauer conducted tasks related to the stop's mission if Tuschoff had complied with Trooper Marrott's requests. However, it is Tuschoff's noncompliance that caused Trooper Hausauer to delay the inquiry into the window tint issue and assist

---

[4] Although, as already noted, while the initial mission of the traffic stop was to investigate the window tint, that was simply a pretext so that officers could undertake a drug investigation.

Trooper Marrott with the dog sniff. Again, a delay is not unreasonable when it is the suspect's own actions that cause the delay. *See United States v. Richards*, 500 F.2d 1025, 1029 (9th Cir. 1974) (Finding that it was not the police officer's actions that caused the stop to be drawn out, but that the suspects "unsatisfactory responses to legitimate police inquiries were the principal cause of the extended" stop). Thus, Trooper Hausauer's delay in the window tint investigation to assist Trooper Marrott with Tuschoff's noncompliance was not unreasonable.

In sum, even if the incident lacked the proper reasonable suspicion to conduct a dog sniff, the delay was not unreasonable because Tuschoff's own actions prolonged the traffic stop. However, this traffic stop did not lack reasonable suspicion to conduct a dog sniff. The Court will address this issue in the following section.

## 2. Reasonable Suspicion

Even were the Court to determine Troopers Hausauer and Marrott unreasonably prolonged the duration of the traffic-stop, if supplemented with a reasonable suspicion of criminal activity, the delay is justified. The Court next considers whether the Troopers had reasonable suspicion in order to delay the traffic-stop constitutionally.

It is undisputed that the original purpose of the traffic-stop was to issue a misdemeanor citation for an unlawful window tint. It *is* disputed whether the Troopers had a reasonable suspicion that Tuschoff was in the possession of drugs.

Initially, it stands out to the Court that Tuschoff was the subject of a six-month long drug trafficking investigation. This investigation was telling. Officers repeatedly found individuals who, after having met with Tuschoff moments prior to their individual arrests,

MEMORANDUM DECISION AND ORDER - 13

were in possession of Methamphetamine. In subsequent interviews, each independently confirmed they had purchased the drugs from Tuschoff. Then, on July 1, 2019, when ISP detectives learned that Tuschoff went to Pocatello to meet with two individuals from Arizona, they became suspicious that he had purchased drugs from these individuals. Detective Sweesy communicated to Troopers Hausauer and Marrott this suspicion and directed the Troopers to stop Tuschoff on Interstate 84. Because Detective Sweesy knew this information, and had developed a reasonable suspicion of drug trafficking, when he communicated an appropriate order to the Troopers to conduct a traffic-stop, the Troopers—like Detective Sweesy—had a reasonable suspicion of drug trafficking as well.

Tuschoff attempts to rely on *United States v. Jensen* to support his conclusion that Troopers Hausauer and Marrott had to be involved in the actual investigation. 425 F.3d 698, 701 (9th Cir. 2005). Tuschoff essentially argues that Troopers Hausauer and Marrott lacked actual knowledge of the investigation because they were not a part of the task force actively investigating him. However, as already explained, the collective knowledge doctrine allows the court to impute knowledge among officers in two circumstances: (1) where two officers are involved in the investigation, but have not communicated facts individually learned, and (2) where an officer with personal knowledge of an investigation, giving rise to a reasonable suspicion, orders another officer to make an arrest. *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010). As explained in *Villasenor*, the court in *Jensen* was elaborating on the first situation in which the collective knowledge doctrine occurs, while the case before the Court today involves the second situation. Thus, *Jensen* is not helpful to the Court's inquiry. Here, detective Sweesy had person knowledge of

Tuschoff's drug trafficking investigation which gave rise to a reasonable suspicion that he was engaged in criminal activity in Pocatello. Thus, the collective knowledge doctrine applies, and when he ordered Troopers Hausauer and Marrott to conduct a traffic stop, his knowledge and suspicion was imputed to them allowing them to properly conduct a dog sniff.

Although the Court agrees that the Fourth Amendment does not permit officers to prolong a traffic stop in order to establish reasonable suspicion to conduct a dog sniff, here, the Court finds the officers *had* reasonable suspicion to conduct the dog sniff and *could* prolong the traffic stop if required. The Court will next address the exit order.

## C. The Exit Order

Tuschoff next argues that the Troopers did not have a legal basis for ordering him to exit his vehicle. This court has held that officers unlawfully expand the scope of the traffic stop when they order an individual to exit their vehicle for "investigative purposes unrelated to the mission of a lawful traffic-stop, absent a reasonable articulable suspicion the person is engaged in criminal activity. *United States v. Wrobel*, 295 F. Supp. 3d 1127, 1133 (D. Idaho 2018). In this case, however, the Court has already determined that the collective knowledge doctrine applies, thus imputing the reasonable suspicion that Tuschoff was trafficking drugs. Accordingly, Troopers Hausauer and Marrott had reasonable suspicion to investigate the window tint violation *and* reasonable suspicion to investigate if Tuschoff was trafficking drugs. During the course of the stop, Trooper Marrott requested that Tuschoff exit the vehicle to safely conduct a drug sniff. Because this exit order related to the reasonable suspicion that Tuschoff was trafficking drugs, the Court

finds there was a legal basis for Trooper Marrott to request that Tuschoff exit his vehicle.

In sum, the Court finds that the facts known to Trooper Marrott at the time, through the collective knowledge doctrine, are sufficient to establish a reasonable suspicion that Tuschoff was engaged in criminal activity. Therefore, Trooper Marrott has a sufficient legal basis to order Tuschoff to exit his vehicle.

### D.  The Arrest

Finally, Tuschoff argues that the Troopers did not have a legal basis to arrest him for "Obstruct and Delay." An officer can arrest an individual who "willfully resists, delays or obstructs any public officer, in the discharge, or attempt to discharge, of any duty of his office." Idaho Code § 18-705. A lawful arrest requires probable cause that the individual was violating the statute. *State v. Bishop*, 146 Idaho 804, 816 (2009). Probable cause exists when, during the arrest, the facts and circumstances within an officer's knowledge would be sufficient to warrant a reasonable person in the same situation in believing that a crime had been committed. *Stubbs v. Las Vegas Metro. Police Dep't*, 792 F. App'x 441, 442 (9th Cir. 2019).

Trooper Marrott repeatedly asked Tuschoff to exit his vehicle so he could deploy his dog around the vehicle. In return, Tuschoff repeatedly questioned the order. Trooper Marrott first answered that Tuschoff needed to exit the vehicle for safety. Trooper Marrott then began explaining that *Pennsylvania v. Mimms* gave him authority to ask Tuschoff to exit his vehicle for any reason.[5] Trooper Marrott also explained that if Tuschoff did not

---

[5] It is reasonable under the Fourth Amendment for an officer to order the driver to exit the vehicle after the vehicle has been lawfully detained for a traffic violation. *Pennsylvania v. Mimms*, 434 U.S. 106

MEMORANDUM DECISION AND ORDER - 16

comply with the exit order, he would be arrested for "obstruct and delay." Finally, Trooper Marrott threatened to taze Tuschoff.

In sum, Tuschoff's repeated refusal to comply with the exit order delayed Trooper's Marrott's duty to deploy the dog and investigate whether Tuschoff was trafficking drugs. Thus, Trooper Marrott had a sufficient basis for believing that Tuschoff was "willfully resist[ing], delay[ing] or obstruct[ing]" his "discharge, or attempt to discharge, of any duty of his office." Idaho Code § 18-705. Therefore, Trooper Marrott had a sufficient legal basis to arrest Tuschoff for violating Idaho Code Section 18-705.

## V. CONCLUSION

In sum, the Troopers' investigatory search of Tuschoff's vehicle complied with the Fourth Amendment because the Troopers had reasonable suspicion that Tuschoff was violating Idaho Code Section 49-944, *and* reasonable suspicion that Tuschoff was trafficking drugs. The reasonable suspicion that Tuschoff was trafficking drugs was based on the collective knowledge doctrine. The officers satisfied the collective knowledge doctrine because the investigatory officer, Detective Sweesy, had personal knowledge of facts giving rise to a reasonable suspicion and communicated an appropriate order to Troopers Hausauer and Marrott to conduct a traffic stop.

---

(1977). However, the Supreme Court has narrowed this holding, clarifying that an officer's exit order is only legitimate when it is to promote the officer's safety, not when the order detours the stop into the investigation of other crimes. *Rodriguez v. United States*, 575 U.S. 348, 349 (2015). Thus, Trooper Marrott's statement that *Pennsylvania v. Mimms* gave him the authority to order a driver to exit the vehicle "for any reason," is not completely accurate, the exit order has to be related to safety concerns. That said, even were this statement completely erroneous (which it is not), it would not negate the order itself. See, e.g., Duckworth v. Eagan, 492 U.S. 195 (1989) (officer's misstatement of state law did not invalidate Miranda waiver).

Additionally, the traffic stop was merely a pretext stop and the prominent reason for the stop was the suspicion that Tuschoff was trafficking drugs. The pretext stop was valid because the officers had objective, probable cause to believe that Tuschoff was violating a traffic law.  Because there was a reasonable suspicion to investigate drug trafficking, it was appropriate for Trooper Marrott to conduct a dog sniff and order Tuschoff to exit the vehicle. Finally, Tuschoff's repeated refusal to comply with the exit order delayed Trooper's Marrott's duty to deploy the dog and investigate whether Tuschoff was trafficking drugs, which provided a sufficient legal basis to arrest Tuschoff for violating Idaho Code Section 18-705.

Accordingly, the Court DENIES Tuschoff's Motion.

## VI. ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.  Tuschoff's Motion to Suppress (Dkt. 46) is **DENIED.**

DATED: March 10, 2021

David C. Nye
Chief U.S. District Court Judge